Peggy Ann GARDNER, Mary Jane Eckert and Barbara Judge

v.

COMMONWEALTH of Pennsylvania, DE-PARTMENT OF ENVIRONMENTAL RESOURCES, Appellant.

Mrs. Peggy Ann GARDNER, Mrs. Barbara Judge and Mrs. Mary Jane Eckert, Petitioners,

v.

DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 14, 1995.
Decided April 25, 1995.

Virginia J. Davison, Asst. Counsel, for appellant, respondent Dept. of Environmental Resources.

Stanley R. Geary, for appellees, petitioners Gardner, Eckert and Judge.

Before SMITH and PELLEGRINI, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

Before us are consolidated appeals arising from the efforts of a property owner to seek compensation for coal rights under land that was taken as part of Moraine State Park. This is the second time this case has been before this court. In *Gardner v. Department of Environmental Resources*, 145 Pa.Commonwealth Ct. 345, 603 A.2d 279 (1992) (*Gardner I*) we determined that the taking issue was not ripe for adjudication because Peggy Ann Gardner, Mary Jane Eckert and Barbara Judge (collectively, Gardners) did not request a variance under the statute prohibiting the mining of the coal from the Commonwealth of Pennsylvania, Department of Environmental Resources (DER). Before us today are DER's appeal of the order of the Court of Common Pleas of Butler County (trial court) finding that the case was ripe for adjudication and appointing a Board of Viewers to determine damages. We also have Gardners' cautionary petition for review of an order of the Environmental Hearing Board (EHB) deciding that the case is not yet ripe for determination because Gardners had not exhausted their administrative reme-

dies necessary to determine whether a taking had occurred.

In 1967, the 189.325–acre property in question was condemned for recreational purposes by DER's predecessor agency, the Department of Forests and Water, except that the rights pertaining to surface mining of coal upon the premises were not taken.[1] At that time, the Department of Forests and Water indicated that it had no objection to the removal of coal from the property. No mining occurred after the condemnation.

In 1971, the Surface Mining Conservation and Reclamation Act (Pa.SMCRA), Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§ 1396.1–1396.31,[2] was amended to prohibit mining within 300 feet of a public park, except by variance based on special circumstances. Section 4.2(c) of Pa.SMCRA, 52 P.S. § 1396.4b(c), provides:

> no ·operator shall conduct surface mining operations ... within three hundred feet of any public building, *public park*, school.... The secretary may grant operators variances to the distance requirements herein established where he is satisfied that special circumstances warrant such exceptions and that the interest of the public and landowners affected thereby will be adequately protected.... (Emphasis added.)

In 1988, because mining was prohibited, absent a variance, Gardners filed a petition for the appointment of viewers in the court of common pleas claiming a de facto taking of their mining rights had occurred by the statutory prohibition of mining in public parks. Denying their request for the appointment of viewers, the trial court held that Gardners had not exhausted the administrative remedies to obtain permission to remove the coal through the variance procedures in Section

---

1. Although the initial Declaration of Taking sought to condemn a fee simple interest in the property, a Declaration of Relinquishment was filed by the Department of Forests and Water revoking the condemnation with respect to strip and surface coal mining rights and revesting those rights in the prior owner. The property had been mined prior to the condemnation.

2. Pa.SMCRA had previously been titled the Bituminous Coal Open Pit Mining Conservation Act and was retitled and amended by the Act of

November 30, 1971, P.L. 554. The 1971 amendments were necessary to bring Pa.SMCRA in conformity with The Federal Surface Mining and Control Act, 30 U.S.C. §§ 1201–1328. The federal act allows states to administer their own exclusive regulatory program for surface mining and reclamation if the state statutes are consistent with the requirements under the federal act. *See Pennsylvania Coal Mining Association v. Watt*, 562 F.Supp. 741, 743 (M.D.Pa.1983).

4.2(c) of Pa.SMCRA. On appeal, this Court agreed that the Gardners' claim was not ripe because they had not applied for a variance that may be available under the statute and, therefore, there was no final decision of the agency regarding the application of the regulations to the property at issue. *Gardner I*.

To obtain a "final decision" from DER, the Gardners then requested DER to preliminarily determine whether they would qualify for a variance. DER responded in several letters that specific information was necessary before a determination could be made, including information on exploration and operation of their proposed mine and on reclamation plans. Arguing both that no grounds existed for a variance and that DER had no intention of granting them a variance, the Gardners appealed to the EHB the requirement that extensive information be provided before a variance determination was made by DER. Before the EHB, DER and Gardners entered a "Consent Adjudication" stipulating, in pertinent part:

1. The Department and the Gardners agree that the information presently available to the Department is sufficient for the Department to rule upon a variance to conduct surface coal mining activity in Moraine State Park.

2. The Department hereby denies the variance.

3. The Gardners may appeal this denial to the Environmental Hearing Board as a final action of the Department.

. . . .

6. The parties agree that the Department will undertake a program of geophysical testing and drilling . . .[3]

(R.R.A 26a). The EHB approved the Consent Adjudication on March 17, 1993. The Gardners did not take an appeal as to any of the issues addressed in the Consent Adjudication, including the denial of the variance.

After the geological studies required by the Consent Adjudication were completed, Gardners asked DER to compensate them for the loss of their mining rights to the coal deposits discovered in the testing based on their belief that such a request was contemplated by the Consent Adjudication after the studies. DER refused to compensate them for their coal rights because they questioned whether the coal could be economically mined in accordance with all relevant laws. Based on DER's refusal to compensate them for the coal deposits, the Gardners filed two different actions. They appealed DER's refusal to compensate them to the EHB as well as filing a Petition for the Appointment of a Board of Viewers with the trial court seeking compensation for the coal in the property.

To their Petition for a Board of Viewers to the trial court, the Gardners attached the Consent Adjudication arguing that *Gardner I* stood for the proposition that DER's denial of a variance constitutes a taking making the issue "ripe." DER filed preliminary objections to the Board of Viewers Petition again contending Gardners' taking action was not ripe because they did not exhaust their administrative remedies by appealing the variance denial. Moreover, DER contended that its actions were an exercise of its regulatory police power and not its eminent domain powers so there was no taking. The trial court granted the petition for appointment of a Board of Viewers and dismissed DER's preliminary objections, holding the taking action was ripe and that a taking had occurred.[4]

As to Gardners' appeal before the EHB, the EHB held that it generally has jurisdiction to determine if a taking occurred by DER's actions but that it did not have jurisdiction in this case because Gardners failed to exhaust their administrative appeals by appealing the variance denial before seeking a determination that a taking had occurred. The EHB stated that, if the claim had been ripe, after going through the taking analysis, they would have determined that a taking had occurred. Unlike the trial court, the

---

3. The geophysical testing listed included VLF profiles of the highwall, electrical resistivity soundings, and core borings in several places. (Reproduced Record to the Commonwealth's appeal, (R.R.A), 26a).

4. The trial court also stated "[t]he burden will rest on the Gardners to establish that it will be practical to mine the coal without violating the Clean Streams Act."

EHB in effect adopted DER's position that Gardners were required to exhaust their administrative remedies by appealing the variance denial before the taking claim was ripe for determination.

■ Before this court are DER's appeal from the trial court decision appointing a Board of Viewers [5] and Gardners' petition for review of the EHB's decision [6] holding that the taking issue was not ripe. As to the trial court's decision, DER contends that the trial court erred in determining that an appeal to the EHB of the variance denial is not necessary under the exhaustion of administrative remedies doctrine. DER also contends there has been no determination that a taking has occurred and therefore the trial court's action in appointing a Board of Viewers is in error. DER also argues that it was acting under its police powers which cannot result in a taking. Conversely, as to the EHB's decision, Gardners contend the EHB erred in holding that they were required to pursue an appeal to the EHB of the variance denial, and that the determination of whether a regulatory taking has occurred is solely within the province of the court of common pleas.[7]

The central issue in both appeals is whether the taking claim was ripe for adjudication or whether the Gardners must first exhaust their administrative appeals of the variance denial. If this claim is ripe, we must then determine whether the EHB or the trial court has jurisdiction to determine whether a taking had occurred by DER's actions.

## I.

■ DER contends that the trial court erred in appointing a Board of Viewers because Gardners were required to exhaust their administrative agency appeals before the taking claim became ripe. Ripeness and exhaustion are similar in that they both deal with timing of judicial review but they are

distinct concepts. Ripeness arises out of a judicial concern not to become involved in abstract disagreements of administrative policies. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It has been defined as the presence of an actual controversy. *American Council of Life Insurance Companies v. Foster*, 134 Pa.Commonwealth Ct. 634, 580 A.2d 448 (1990). It insists on a concrete context, where there is a final agency action so that the courts can properly exercise their function. The doctrine of ripeness is described as a legal principle "instructing courts to review government actions only when the government's position has crystallized to the point at which a court can identify a relatively discrete dispute." Davis & Pierce, *Administrative Law Treatise*, vol. II, § 15.12 (3rd edition). The doctrine requires a court to evaluate the fitness of the issues for judicial determination, as well as the hardship to the parties of withholding court consideration. *Abbott Laboratories*.

The purpose of the ripeness requirement was also set forth in *Abbott Laboratories:*

[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.*, at 148–49, 87 S.Ct. at 1515.

■ The doctrine of ripeness is essential to cases asserting that a statute or regulation effects a taking without just compensation because of the nature of a taking claim. Whether a statute has resulted in a taking and the scope of the taking can only be

---

**5.** Our scope of review of the trial court's order is to determine whether the trial court abused its discretion or committed an error of law. *Gardner I.*

**6.** Our scope of review of the EHB's decision is to determine whether the record contains substantial evidence to support the EHB's findings of fact, and whether the EHB committed errors of

law or constitutional violations. *Mock v. Department of Environmental Resources*, 154 Pa.Commonwealth Ct. 380, 623 A.2d 940 (1993).

**7.** The Gardners also contend that the EHB would not have jurisdiction over an appeal of the variance denial because it was in a Consent Adjudication approved by EHB.

known from an application of the statute or regulation to the particular facts of the case:

> It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.[8]

*MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). *See also Gardner I.* A court can only know if the agency went "too far" and how much "too far" after the agency has finally acted. As the Supreme Court stated in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985):

> [A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.[9]

■ Exhaustion, however, is more concerned with agency autonomy, requiring resort to administrative processes so as to assure that agency decision making is not unduly disrupted. Aman & Mayton, *Administrative Law* § 12.8 (1993). The exhaustion doctrine is a rule of judicial administration created under the inherent powers of the court which has since been incorporated in legislation requiring that statutorily prescribed remedies be strictly pursued. Aman & Mayton, § 12.9.1. *See also Ohio Casualty Group of Insurance Companies v. Argonaut Insurance Company*, 514 Pa. 430, 525 A.2d 1195 (1987); 1 Pa.C.S. § 1504. The doctrine

of exhaustion prohibits prospective parties to administrative agency actions from bypassing that process and challenging the administrative action directly in the courts. *Pye v. Commonwealth, Insurance Department*, 29 Pa.Commonwealth Ct. 545, 372 A.2d 33 (1977), *affirmed per curiam*, 479 Pa. 146, 387 A.2d 877 (1978). The reasons for requiring exhaustion are that it is more efficient to allow an agency to proceed uninterrupted until its conclusion so that it can find facts, apply its expertise and exercise its discretion. 2 Davis, *Administrative Law Treatise* § 15.2. The doctrine also allows agencies the opportunity to correct their own mistakes. *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980).

■ Exhaustion would be appropriate to apply in this case if the Gardners were challenging DER's determination that a variance should not be granted. Gardners, however, agree with DER that the denial was correct but are seeking damages that result from the statutory prohibition of the mining of their coal. They are not bypassing the agency appeals and challenging the action directly in the courts, but in fact are agreeing with it. DER's contention that the action is not ripe unless administrative appeals are taken misconstrues the requirement for a final agency action with the concept of exhaustion of administrative agency review. This issue was addressed in *Williamson County Regional Planning Commission*.

■ In that case, a landowner's subdivision development plat was not approved by the local planning commission and the landowner brought an action in federal court under 42 U.S.C. § 1983. The Supreme Court held that the issue of a regulatory taking due to the rejection of its subdivision

---

8. The use of the phrase "too far" in *MacDonald*, refers to the decision in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), where the Supreme Court first held that a regulation can effect a taking if the regulation "goes too far" in qualifying the uses for private property, but whether it goes too far is a question of degree that cannot be determined by general propositions.

9. Similarly in *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.*, 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981), the Supreme Court held that a pre-enforcement challenge to federal surface mining act was not ripe because:

> There is no indication in the record that appellees have availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance ... or a waiver.

development plan was not ripe because the landowner had not applied for variances from restrictions on the plat. In determining that the issue was not ripe due to the lack of a final agency decision, the Supreme Court distinguished the requirement for ripeness and the requirement for exhaustion:

The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable. While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. . . .

. . . [R]espondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.

Resort to those procedures would result in a judgment whether the Commission's action violated any of respondent's rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed.

*Williamson County Regional Planning Commission,* 473 U.S. at 192–93, 105 S.Ct. at 3119–20, (citations omitted). So then, for a regulatory taking action to be ripe the final decisionmaker must have acted, not the entity with the final review powers.

Once the variance is denied by DER, in this case, the administrative agency has reached a final decision and an appeal of the denial to the EHB would be nothing more than a review of that final decision. The express provisions of Section 4.2(c), which allow a variance, give the Secretary of DER the authority to grant a variance and the discretion to make such a grant if "[the secretary] is satisfied that special circumstances warrant such exceptions." Section 4.2(c) of Pa.SMCRA, 52 P.S. § 1396.4b(c). *See also* Section 3 of Pa.SMCRA, 52 P.S. § 1396.3 (definition section). While the EHB would have authority to review the decision of DER on such a variance, the Gardners are not required to take such action to make their claim ripe.[10] The EHB cannot exercise any discretion as to a variance to surface mining in public parks but would only be able to remand to the DER if they found an error of law or abuse of discretion in DER's determination or process. *See* EHB decision in this case, EHB Docket No. 93–381–E, slip op. at 8.

Because DER is the entity charged with implementing the statutory variance exception and is given discretion in this decision, its decision stated in the Consent Adjudication to deny the variance is a final decision making a taking claim based on the statute and the denial of variance ripe for adjudication under *Williamson Planning Commission.* The requirement of exhaustion of administrative appeals is inapplicable because the Gardners are in no way challenging the action of an administrative agency without allowing the administrative process the chance to correct the decision; instead they are relying on the agency's determination that there are no special circumstances entitling them to a variance.

**10.** Section 4 of the Environmental Hearing Board Act, Act of July 13, 1988, P.L. 530, 35 P.S. § 7514, states the EHB's jurisdiction. Gardners contend that in this case the EHB would not have jurisdiction over an appeal of the variance denial because it would be an appeal from their own order approving the Consent Adjudication. Gardners submit no support for their argument that, in essence, a settlement reached before a tribunal and approved by that tribunal is an appeal of the action within the settlement and an affirmance of that action. Because Gardners agreed within the Consent Adjudication that the variance denial was a final action of DER appealable to the EHB and because of our decision on the ripeness issue, we need not address their contradictory argument.

## II.

Once DER denied the variance to the statutory prohibition of surface mining in Moraine State Park, the taking claim was ripe for adjudication, making the question before us whether the EHB or the trial court had jurisdiction to determine whether a taking had occurred. This issue has been discussed in two recent cases, one by our Supreme Court and one by this Court.[11]

In *Beltrami Enterprises, Inc. v. Commonwealth, Department of Environmental Resources,* 159 Pa.Commonwealth Ct. 72, 632 A.2d 989 (1993), we held that the EHB has jurisdiction to determine whether a regulatory taking has occurred as a result of a DER enforcement action. In that case, landowners, who held a license for non-coal surface mining, were informed by DER that it planned to use surface rocks to reclaim an abandoned coal mine on the property. The landowners first appealed DER's action to the EHB but that appeal was stayed when they filed a Petition to Appoint a Board of Viewers in the court of common pleas alleging a taking without just compensation. This court framed the issue as whether the EHB or the trial court under the Eminent Domain Code should determine the question of whether DER's action was a taking. *Id.* at 79, 632 A.2d at 992.

We held that the EHB had exclusive jurisdiction to determine whether or not a taking had occurred by DER's order on reclamation. We reached this holding by stating that, although the Eminent Domain Code gives the courts of common pleas jurisdiction for condemnation proceedings, we have held that where an entity has the power of eminent domain but a taking action does not result, the injured parties must seek recourse by some vehicle other than the Eminent Domain Code, *Id.* at 78, 632 A.2d at 992, for example, by resort to the Municipalities Planning Code where zoning regulations are asserted to constitute a taking. *See Gaebel v. Thornbury Township,* 8 Pa.Commonwealth Ct. 399, 303 A.2d 57 (1973). We found that DER has eminent domain powers but did not use them to condemn Beltrami's land for reclamation purposes. Based on DER's actions, over which the EHB would have review powers and, *inter alia,* any issues that may be raised in that context, we held that the EHB had exclusive jurisdiction over the taking claim and that the trial court would have jurisdiction over determining the amount of damages.

More recently, however, in *Machipongo Land & Coal Company, Inc. v. Commonwealth, Department of Environmental Resources,* 538 Pa. 361, 648 A.2d 767 (1994), our Supreme Court addressed the jurisdiction of the EHB to hear regulatory takings cases. In that case, landowners sought review of an Environmental Quality Board regulation designating a portion of their land as unsuitable for surface mining. Landowners contended that the regulation constituted a regulatory taking of their real property. After affirming this court's determination that the taking issue was ripe because there were no sufficient administrative remedies for their claim, the Supreme Court turned to the question of whether this court erred in transferring the case to the EHB. *Id.* at 365, 648 A.2d at 769. The Supreme Court initially determined that this court erred in transferring the case to the EHB because the EHB lacks the express statutory jurisdiction to hear pre-enforcement challenges to Environmental Quality Board regulations, citing *Arsenal Coal Co. v. DER,* 505 Pa. 198, 477 A.2d 1333 (1984) (pre-enforcement review of regulations is not within authority of the EHB because legislature gave EHB jurisdiction only over appeals from DER application of regulations). Having determined that the EHB lacked jurisdiction, the issue became which court had jurisdiction.

In footnote 8 of *Machipongo,* the Supreme Court stated that it is the substance of a takings claim, not its form, which determines

---

11. Prior to these cases, as stated in this court's opinion in *Machipongo Land & Coal Company v. Commonwealth, Department of Environmental Resources,* 155 Pa.Commonwealth Ct. 72, 95 n. 20, 624 A.2d 742 n. 20 (1993), there were other cases reviewing the EHB's decision on whether a regulatory taking had occurred but none had squarely addressed the EHB's jurisdiction. *See Mock, supra; Reilly v. Commonwealth, Department of Environmental Services,* 37 Pa.Commonwealth Ct. 608, 391 A.2d 56 (1978).

whether the court of common pleas has jurisdiction rather than this court. *Machipongo*, 538 Pa. at 368 n. 8, 648 A.2d at 770 n. 8. The Supreme Court stated that in form that case was a pre-enforcement challenge of an Environmental Quality Board regulation, but in substance it was a challenge to a regulatory taking by the designation of land as unsuitable for surface mining. Because de facto taking claims are eminent domain proceedings which "are properly adjudicated in the first instance by the court of common pleas of the county in which the property is located," the Supreme Court held that the common pleas court had jurisdiction over that case. *Id.* at 368, 648 A.2d at 770.

The Gardners argue that the Supreme Court's holding in *Machipongo* overruled this court's determination in *Beltrami* that the EHB has jurisdiction over taking claims. We cannot agree that the Supreme Court's decision has that effect.[12] The decision in *Machipongo* does not hold that the EHB never has jurisdiction over taking claims. Instead, the Supreme Court specifically held that the EHB could not have jurisdiction over a takings claim that in form is a pre-enforcement challenge to a regulation of the Environmental Quality Board because the EHB's jurisdiction was limited to reviewing post-enforcement challenges to Environmental Quality Board regulations, citing *Arsenal Coal.* The Supreme Court stated, "absent any DER enforcement action, the EHB is without any legislatively-conferred jurisdiction over this matter." *Machipongo*, 538 Pa. at 367–68, 648 A.2d at 770. It was only after determining that the EHB had no jurisdiction under the statute that the Supreme Court determined the takings claims in the first instance should go to the court of common pleas rather than to this court.

The claim in this case is not a pre-enforcement challenge to Environmental Quality Board regulations, as in *Machipongo*, but is closer to a review of a DER order, as in *Beltrami.* The underlying claim is that the legislative scheme denies the Gardners any use of their coal mining rights because of their location within Moraine State Park.

However, because the legislative prohibition provides the possibility of a variance, Section 4.2(c) of Pa.SMCRA, 52 P.S. § 1396.4b(c), which a landowner must request before bringing the taking claim, *Gardner I*, it is DER's denial of a variance and the statutory scheme in combination that must be established for a finding of a taking. Because the decision of DER that a variance is inappropriate was necessary to the claim that the statutory scheme effected a taking, the EHB in this case, unlike in *Machipongo*, has legislatively-conferred jurisdiction under Section 4 of the Environmental Hearing Board Act, Act of July 31, 1988, P.L. 530, 35 P.S. § 7514.

▮ In general these cases should proceed like the case of *Mock v. Department of Environmental Resources*, 154 Pa.Commonwealth Ct. 380, 623 A.2d 940 (1993). In *Mock*, landowners property was largely designated wetlands and they applied for a permit to fill part of the wetlands so that they could build an auto repair shop. After DER denied their application for a permit, landowners appealed the decision to the EHB contending either the denial was in error or the denial constituted a taking of their property. In cases like this one where the taking claim is ripe once DER took its action, because the statute gave DER sole discretion to make a final decision on a variance, an appeal should be presented to the EHB raising DER's action as constituting a taking without just compensation. In other cases, for example if EHB has de novo review of DER's actions, the appeal should be presented in the alternative, that is, either DER's action is incorrect or DER's action constituted a taking without just compensation.

However, the parties, with tacit approval of the EHB, did not follow these procedures. The irregularity began with the Gardners' appeal of DER's information requirements but was magnified by the misleading nature of the Consent Adjudication. The Consent Adjudication benefited both parties in that it determined that a variance was inappropriate without requiring that extensive plans for mining be submitted when both parties believed those plans would never be put into

---

12. Although *Beltrami* was filed prior to *Machipongo* being argued before the Supreme Court, the Supreme Court did not address that decision in its *Machipongo* opinion.

action. The Consent Adjudication also set up a requirement that the extent of the coal be determined by DER with a sharing of information with the Gardners. There is no express purpose for these studies in the agreement and such studies appear useless after a normal variance denial. It is not difficult to conclude that the purpose of these studies was to determine the amount of compensable coal for the purposes of settlement on the taking issue. The Gardners asserted as much to the EHB, and as the dissenting opinion to the EHB's decision notes, DER did not dispute it.

We agree with the dissent that it is incomprehensible to put Gardners out of court after they have been misled by the Consent Adjudication and by DER's actions into believing that they will be compensated for the coal on the property. Because they filed these actions in a timely manner upon DER's refusal to compensate them, we hold that the EHB should have heard and decided the taking claim. Although we realize a remand is rather redundant due to the EHB's statement that it would find a taking, we must remand because it held that it did not have jurisdiction to make such a determination.

Accordingly, the case will be remanded to the EHB so that it can determine whether a taking has occurred. Assuming the EHB finds a taking has occurred, the determination of the amount of damages must then be made by the trial court. *Beltrami.* The order of the trial court is vacated because the trial court did not have jurisdiction to determine that a taking had occurred; nor was it able to appoint a Board of Viewers prior to the EHB determining that a taking had occurred. The order of the EHB is reversed and the case is remanded.

### ORDER

AND NOW, this 25th day of April, 1995, the order of the Court of Common Pleas of Butler County, date April 28, 1994, No. 93–11010, is vacated. The order of the Environmental Hearing Board, dated September 7, 1994, No. 93–381–E, is reversed and the case

is remanded to the Environmental Hearing Board in accordance with this decision.

Jurisdiction relinquished.